**EXHIBIT A**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - -

INCREDIBLY EDIBLE DELITES, INC., and
INCREDIBLE FRANCHISE CORPORATION,
    Plaintiffs,

vs.   :   CIVIL ACTION
      NO. 3:02CV1529

EDIBLE ARRANGEMENTS, LLC, and
EDIBLE ARRANGEMENTS FRANCHISE
GROUP, INC.,
    Defendants.

- - -

DEPOSITION OF ELLEN BETH DAVIS

- - -

Wednesday, November 6, 2002
Commencing at 10:55 A.M.

- - -

Harding, Earley, Follmer & Frailey
The Commons at Valley Forge East, Suite 86
1288 Valley Forge Road
Valley Forge, Pennsylvania 19482-0750

- - -

SUSAN K. MacSORLEY, R.P.R.
211 Kleyona Avenue
Phoenixville, Pennsylvania 19460
(610) 917-0221

Page 2

COUNSEL APPEARED AS FOLLOWS:

    HARDING, EARLEY, FOLLMER & FRAILEY
    BY: FRANK J. BONINI, JR., ESQUIRE
        JOHN F. A. EARLEY III, ESQUIRE
    Suite 86
    The Commons at Valley Forge East
    1288 Valley Forge Road
    Valley Forge, Pennsylvania 19482-0750
      For Plaintiffs

    CELLA, McKEON & WILLIAMS
    BY: KEVIN P. WALSH, ESQUIRE
    21 Washington Avenue
    North Haven, Connecticut 06473
      For Defendant Edible Arrangements, LLC

    HALLORAN & SAGE, LLP
    BY: THOMAS J. FINN, ESQUIRE
    One Goodwin Square
    225 Asylum Street
    Hartford, Connecticut 06103
      For Defendant Edible Arrangements
      Franchise Group, Inc.

- - -

I N D E X

Witness:                              Page
ELLEN BETH DAVIS

    By Mr. Finn                       6
    By Mr. Walsh                    128
    By Mr. Bonini                   197

- - -

Page 3

E X H I B I T S

DEFENDANTS' EXHIBITS

| Number | | Marked |
|---|---|---|
| 1-EA | Advertising brochure | 131 |
| 2-EA | Advertising brochure | 131 |
| 3-EA | Advertisement from Val-Pak | 131 |
| 4-EA | Advertising brochure | 131 |
| 5-EA | Internet printout from Lycos re: "fruit flowers" search | 188 |
| 6-EA | Internet printout from AOL re: "fruitflowers" search | 188 |
| 7-EA | Internet printout from MSN re: "fruitflowers" search | 188 |

- - -

Page 4

- - -

    MR. BONINI: It is ten o'clock. Ms. Davis is here. We are opening the record. I am present, and we are now waiting for the arrival of counsel for defendants in this matter who have noticed this deposition.

- - -

    ELLEN BETH DAVIS, having been duly sworn, was examined as follows:

    MR. FINN: This is the deposition of Ms. Ellen Davis that is being conducted pursuant to a matter in the United States District Court for the District of Connecticut, captioned Incredibly Edible Delites, Inc., and Incredible Franchise Corporation versus Edible Arrangements, LLC, and Edible Arrangements Franchise Group.

    The deposition is being conducted pursuant to a Court Order permitting discovery on the issues relating to a hearing for preliminary injunction that is currently scheduled for November 13, 2002.

    The defendants, by conducting this deposition, do not waive their right to conduct further and more complete depositions with respect to issues germane to the entire case as a whole. In

Page 89

1  marks prior to the commencement of this lawsuit?
2  A.   All of the marks that we own are licensed. I
3  mean, I don't have an answer.
4  Q.   Ms. Davis, I'm not asking you about all of the
5  marks. I'm asking you about the fruitflower marks. I
6  would like to know when you began licensing them. And
7  you responded you didn't know.
8        Now my question is: Did you begin the
9  licensing on the fruitflower marks before this
10 lawsuit? When I say "this lawsuit," the second
11 lawsuit we're involved in today.
12 A.   When we started using fruitflowers in '98 and
13 we were selling franchises concurrently, all of the
14 marks that we used at the time were licensed to our
15 franchise partners.
16 Q.   Okay. Does your licensing agreement identify
17 which marks are licensed?
18 A.   I believe there were some that are specified
19 that we have registered.
20 Q.   Okay.
21 A.   Our registered marks are included.
22 Q.   Okay. So if you didn't register the
23 fruitflower marks till the month that this lawsuit was
24 commenced, did you license those marks to your
25 franchisees before this lawsuit?

Page 90

1  A.   Any of the marks that we use are included in
2  our document.
3  Q.   But you've only delineated the ones that were
4  registered in the licensing agreement?
5  A.   Only our registered marks.
6  Q.   Have you ever represented to your franchisees,
7  prior to the commencement of this lawsuit, that you
8  own the mark fruitflowers?
9  A.   I don't know what you mean by the word "own."
10 Q.   Well, that you have a mark in fruitflower?
11 A.   Yes. We use it in our advertisements. Yes.
12 Q.   And have any of your franchisees ever
13 expressed any concern about the validity of the
14 fruitflower mark?
15 A.   No.
16 Q.   Do the franchisee -- are the franchisees aware
17 of this lawsuit?
18 A.   Yes.
19 Q.   Are they aware that, if you don't prevail in
20 the lawsuit, that the fruitflower mark -- that they
21 may not be able to continue to use the fruitflower
22 mark?
23 A.   I don't think so.
24 Q.   They're not aware of that?
25 A.   No.

Page 91

1  Q.   Now, just for clarification, the mark that you
2  have with respect -- that is registered with respect
3  to Incredibly Edible Delites, Inc., and that is
4  contained at Exhibit 2 -- could you read into the
5  record what the entire word mark is, please
6  (indicating)?
7  A.   Incredibly Edible Delites, Inc., edible floral
8  creations.
9  Q.   Okay. And that's the entire mark; is that
10 right?
11 A.   That is.
12 Q.   Okay. And portions of that would not
13 constitute the mark; is that right? Do those words
14 individually --
15 A.   To my knowledge, it wouldn't. I'm not a
16 lawyer.
17 Q.   When did you first begin using the fruitflower
18 mark?
19 A.   Well, we started using fruit flowers way
20 before we registered as a domain name. In fact, when
21 we started to look at our old brochures back in '93,
22 '92, we found that we were using the fruit flowers at
23 that point.
24 Q.   And how were you using fruit flowers at that
25 point?

Page 92

1  A.   As part of our brochure, talking about some of
2  our -- what our designs are.
3  Q.   Were they used to describe the design?
4  A.   No. I mean, they were not generic words.
5  They were fruit flowers, meaning the arrangements that
6  we make.
7  Q.   And do you have those brochures going back to
8  '92 and '93?
9  A.   Yes, we do.
10      MR. FINN: Mr. Bonini, I'd like to
11 request a copy of all brochures that IED has in its
12 possession or control.
13      MR. WALSH: If I could inquire, do we
14 have those particular brochures here today, Counsel,
15 since we've traipsed down to Philadelphia at your
16 request to your office? It would facilitate the
17 taking of this deposition if you had those brochures
18 since we're talking about it.
19      MR. BONINI: We can find out. We can
20 look.
21      MR. WALSH: Can we find out before we
22 end this deposition?
23      MR. BONINI: Why don't we take a break
24 right now? Is this an appropriate time for a break?
25      MR. FINN: Sure.

Page 93

1     (Brief recess.)
2 BY MR. FINN:
3 Q. Ms. Davis, we were talking about the date of
4 first use that IED was using the fruitflower mark.
5 And you believe it goes back to '92 to '93?
6 A. Yes.
7 Q. Okay. And your counsel is making an effort to
8 obtain some of those brochures?
9 A. Uh-huh. Right.
10 Q. Do you know what the date of registration of
11 the fruitflower mark is?
12 A. No, I don't know the date.
13 Q. Was it registered immediately before the
14 commencement of this lawsuit?
15 A. Honestly, I don't know the date. It was
16 recent. I can't give you the date. I don't know. I
17 don't know the exact time line.
18 Q. Did you retain counsel to advise IED in
19 connection with registering the mark?
20 A. Yes.
21 Q. And was your counsel Mr. Earley and
22 Mr. Bonini?
23 A. We have business attorneys that do our
24 registrations, but I think they did our mark. Yes,
25 they did.

Page 94

1 Q. Do you know whether or not the registration of
2 the mark has been publicly published yet? Do you know
3 whether it's been published?
4 A. I don't know what that means to be published.
5 Q. Okay.
6     MR. FINN: Mr. Bonini --
7     Could we go off the record.
8     (Discussion was held off the record.)
9 BY MR. FINN:
10 Q. Ms. Davis, in Paragraph 8 of your Declaration,
11 you set forth that:
12     "Through the continuous use of its
13     incredibly edible marks and the fruitflower
14     marks in connection with the goods and
15     services of Incredibly Edible (including the
16     Incredibly Edible franchisees who are licensed
17     to use the mark), the marks have become well
18     known with respect to the quality, sale, and
19     delivery of Incredibly Edible's edible floral
20     fruit bouquets."
21     Do you recall that statement?
22 A. Yes.
23 Q. The statement combines the incredibly edible
24 marks and the fruitflower marks. My question is just
25 with respect to the fruitflower mark.

Page 95

1 A. Okay.
2 Q. What is the basis for the statement that the
3 fruitflower marks have become well known with respect
4 to the quality, sale, and delivery of Incredibly
5 Edible's edible floral fruit bouquets?
6 A. Well, fruit flower is used synonymously with
7 Incredibly Edible Delites, and so we have -- our
8 company has been -- has come to be known as a quality
9 product and a quality item. And so our fruitflower
10 mark -- in the same way Incredibly Edible Delites is
11 associated with quality, so is our fruitflower mark.
12 Q. And when you say that it's associated with the
13 fruitflower mark, what I'm trying to get at is what do
14 you base that statement on?
15 A. Well, we have a business that's been steadily
16 growing, and so we would assume that that steady
17 growth and sale of our franchises means that people
18 like the product. And so if people like the product,
19 they call again, and they order, and they buy, and
20 they tell their friends.
21     And they associate Incredibly Edible
22 Delites with a product of quality and that we deliver
23 what we say. We provide a service.
24 Q. And all of that being said, what is that
25 service -- what is the connection between that service

Page 96

1 and the fruitflower mark?
2 A. The fruitflower mark is used as part of our
3 company mark. So, in other words, when we advertise,
4 we use fruitflowers so people know, when they're
5 calling to order from fruitflowers, that they are
6 going to be getting a product of quality, that it's
7 just not another company down the road selling
8 something, that it's selling Incredibly Edible
9 Delites. It's selling floral fruit and vegetable
10 designs, and it stands for quality.
11 Q. Has the fruitflower mark been used
12 continuously going back to 1992 and '93?
13 A. Continuously in any sort of a pattern, I would
14 say, no. It's been used.
15 Q. It's been used. How would you describe its
16 use if not continuously?
17 A. It's been used in some of our advertising.
18 It's been used, as I said, on our brochures.
19 Q. Is IED using the fruitflower mark continuously
20 today?
21 A. Yes.
22 Q. And since what date has IED been using
23 fruitflower continuously?
24 A. Since the inception of our Web site.
25 Q. And the date on that?

Page 101

1  happened, it's not any information that we would keep
2  around.
3  Q.   Okay.  Do you keep all of your confidentiality
4  agreements with potential franchisees on record?
5  A.   Yes.
6  Q.   And how long do you retain those
7  confidentiality agreements?
8  A.   I don't really know how long we keep that
9  stuff around.  I don't know.
10 Q.   Okay.  Does the confidentiality agreement have
11 a term in it in terms of how long the potential
12 franchisee must keep the information confidential?
13 A.   I'm not aware.  I don't know.
14 Q.   If you have been expending significant
15 resources on the advertising of your fruitflower mark,
16 why is it that you waited until the month of the
17 commencement of this lawsuit to register the mark?
18 A.   Because a mark isn't necessarily something
19 that we feel we have to go out and register.
20 Honestly, we used it continually and didn't see that
21 it was a problem for anybody because it's our Web site
22 address.
23       And in our own naivete, we assumed that,
24 because we own the domain name, that that's a pretty
25 strong mark in itself and that why would somebody else

Page 102

1  want to use our domain name.  And so we didn't
2  register.
3  Q.   Did you check to see if anyone else had
4  registered the same domain name?
5  A.   At the time, yes.  We couldn't have registered
6  it if someone else had registered it.
7  Q.   What service did you register it with?
8  A.   I have no idea.  It was whoever the -- who was
9  putting up our Web site.  They -- you know, I didn't
10 do it myself personally.  I couldn't tell you.  I
11 don't know.
12 Q.   If you didn't register the mark, did you give
13 any indication that you were claiming a mark in
14 fruitflowers such as putting a "TM" next to the word?
15 A.   No.  Because we don't want to mark up our
16 printed material.  It's very aesthetically unpleasing.
17 And so we don't like to have TM's all over the place.
18 It's not very pretty, and so we didn't do it.  And we
19 were given to understand that a mark is something
20 that's through usage claimed and so, using it as we
21 do, it wouldn't be a problem.
22 Q.   And who gave you that information that through
23 usage you would have a right on the mark?
24 A.   Our former counsel.
25 Q.   And you were never advised to register the

Page 103

1  mark?
2  A.   No.
3  Q.   Do you know why -- as you sit here today, why
4  you were never advised to register the mark?
5  A.   I would have no idea.  But I've also mentioned
6  to you that our previous counsel was not giving us
7  very good advice.
8  Q.   In the Complaint of this lawsuit, which I'll
9  locate in one minute, at Paragraph 88 it is alleged
10 that:
11       "Edible Arrangements is using the word
12       fruitflower generically to describe their
13       floral fruit bouquets."
14       Can you describe for me how Edible
15 Arrangements is using the term fruitflower
16 genetically?
17 A.   I know of fruitflower being in their metatags.
18 I only know it from the search engine.
19 Q.   Do you know what the basis of this allegation
20 in the Complaint is?
21 A.   Can you read it to me again, please?
22 Q.   Yes.
23       "Edible Arrangements is using the word
24       fruitflower generically to describe their
25       floral fruit bouquets."

Page 104

1  A.   Well, in a search engine when you search for
2  fruitflower, their Web site was coming up.  That's how
3  I know it was being used.  Fruitflower is not part of
4  their name, and it's not their Web site.  For them
5  it's a word, and so that word was being used to link
6  from that word to their Web site.
7  Q.   When you say for Edible Arrangement it's a
8  word, can you expand on that, please?  What do you
9  mean it's a word to Edible Arrangements?
10 A.   It's one of the many words they use in their
11 metatags.  Fruitflower, delicious, design, whatever
12 they use.
13 Q.   Did they use it in any other manner, to your
14 knowledge?
15 A.   Not that I'm aware of.  I don't know.  I don't
16 know.
17 Q.   Do you know what the source of the information
18 contained in the allegation in Paragraph 88 is?
19 A.   The source, no.  I only know it from the Web
20 site from the metatags.
21 Q.   And you did say that you reviewed Mr. Farid's
22 Affidavit prior to your deposition today?
23 A.   Yes.
24 Q.   Do you recall in seeing Mr. Farid's Affidavit
25 that Edible Arrangements uses the term fruitflower in