EXHIBIT G

Case 3:02-cv-01529-AVC    Document 146-8    Filed 11/30/2005    Page 2 of 26
Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                          Andrea Mirin

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



VOLUME I - Pages 1 - 242


- - - - - - - - - - - - - - - -
INCREDIBLY EDIBLE DELITES, INC.       CIVIL ACTION NO.
and INCREDIBLE FRANCHISE              3:02CV1529(AVC)
CORPORATION
vs.
EDIBLE ARRANGEMENTS, LLC.,
and EDIBLE ARRANGEMENTS
FRANCHISE GROUP, INC.
- - - - - - - - - - - - - - - -




            DEPOSITION OF:  ANDREA MIRIN
            DATE:  September 6, 2005
            HELD AT:  HALLORAN & SAGE,
            315 Post Road West, Westport, CT











            Reporter:  Jayne Ciccotelli, LSR
         Brandon Smith Reporting Service, LLC
                   1-800-852-4589

    44 Capitol Avenue          Six Landmark Square, 4th Fl.
    Hartford, CT  06106        Stamford, CT 06901
    860-549-1850               203-316-8591

9/6/2005                                                    Andrea Mirin

Page 21

1              MR. EARLEY:  As an appropriate person,

2      to be okay.

3         A.    Factually.  There was a meeting upon this

4      notice.  There was a letter sent from you in which

5      specific dates were given that, of the availability.

6      Consultation was made on who was available at the dates

7      you requested.  I was available and, therefore, am here

8      to factually address your questions.

9         Q.    Are you the person at IED with the most

10     knowledge of the topics covered in this notice?

11        A.    I can speak to the issues that are, that are

12     addressed here.

13             MR. WALSH:  That wasn't the question.

14        Q.    That was not the question at all.

15             Are you the person at IED who has the most

16     knowledge regarding the issues that are covered in this

17     notice?

18             MR. CLARK:  Objection as to form.

19        A.    The most knowledge?  Possibly not.

20        Q.    Okay.  Who would you, who would you say has

21     greater knowledge than you with regard to these topics?

22        A.    Possibly, Ellen Davis, Susan Ellman.

23        Q.    And so that I don't mischaracterize your

24     testimony, why were Ellen Davis or Susan Ellman, why

25     are they not here today?

4bb2b768-2614-4350-b73b-ae71509b0d10

Page 23

1    gave us dates of availability, we complied.

2         Q.    Okay.  But my question was was any attempt

3    made within IED to determine other dates that Susan

4    Ellman and Ellen Davis may have been available for

5    their deposition?

6         A.    My understandings was the communications were

7    between our outside counsel and yourself.

8         Q.    That really isn't my question, though.

9              Was any attempt made to determine alternate

10   dates for Susan Ellman's and Ellen Davis's availability

11   so they could testify pursuant to this notice?

12        A.    I don't understand why that would matter.  We

13   have complied with your request for a 30(b)(6) witness.

14        Q.    I'm not asking you to tell me why it matters,

15   I'm asking you to answer the question.

16             Was any attempt made --

17        A.    Not to my knowledge.

18             MR. EARLEY:  I'm going to make an

19   objection.  I believe it's irrelevant, and she has

20   answered.

21             MR. RICH:  Well, I don't believe she's

22   answered and --

23             MR. EARLEY:  I don't see the relevance,

24   where's the relevance here?

25             MR. RICH:  I'm asking why Ellen Davis

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                    Andrea Mirin

Page 29

1        A.   Okay.  I probably reviewed with outside

2    counsel that the request had been made, was our

3    understanding that we have produced -- we had given

4    documents to counsel and they had reviewed and

5    produced, a number of these documents had previously

6    been produced.  Additionally, I reviewed this request

7    with Susan Ellman and Ellen Davis and they consulted

8    their files looking for additional exemplars that may

9    not have reached counsel's office prior to this point.

10       Q.   Okay.  And to your knowledge, has all

11   documentation responsive to this request been produced?

12       A.   "All" is a difficult question.  The answer is

13   to the extent that things had been located initially, I

14   believe either had been given to counsel for review for

15   various production requests or through the office;

16   however, there might be more out there.

17            Additionally, we can't have all of it because

18   some of it -- we don't have examples, there are

19   examples from our many franchisees, Franchise Corp.,

20   Incredibly Franchise Corporation has that which has

21   been sent to us, but that is not necessarily indicative

22   of everything in the free world that's out there.

23            MR. EARLEY:  I'm also going to renew my

24   objection that it's overly broad requiring all

25   documents, there are thousands and thousands of ads.

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                                    Andrea Mirin

Page 35

1        Q.    What is it that you said?

2              MR. WALSH:   Let's have the response read

3    back.

4              (Answer read, page 32 line 24)

5        Q.    Let me ask you this, Ms. Mirin, were you

6    involved in collecting and gathering the documentation

7    that is attached to the letter that I showed you, the

8    first page of Exhibit 6?

9        A.    No, I had not been.  Not personally.

10       Q.    Do you know who was involved in gathering

11   this information?

12       A.    At the company, Susan Ellman, Ellen Davis.

13       Q.    At any time before or subsequent to this

14   production, did you review this documentation?

15       A.    I don't know what's in this specific

16   collection.  Have I possibly seen documents that are in

17   here? yes.

18       Q.    Okay.  The production consists of IED Bates

19   stamp numbers 000001 through IED 001291.

20       A.    Without looking at all of these documents

21   individually, I acknowledge that those numbers are what

22   they appear to be.  If one is missing, I do not know at

23   this time.

24       Q.    Understood.  At any time, did you review

25   these documents?

4bb2b768-2614-4350-b73b-ae71509b0d10

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                          Andrea Mirin

Page 67

```
1                MR. EARLEY:  Again, this is my objection

2     before, the particular request being overly broad.

3                MR. RICH:  Noted.

4        Q.   Are you confident that IED has reviewed, IED

5     collectively referring to both entities in this matter,

6     has referred -- excuse me -- has reviewed all of the

7     production that is responsive to the issues raised in

8     the 30(b)(6) notice that we've been talking about

9     today?

10               MR. EARLEY:  I'm going to object, renew

11    that the request is overly broad and burdensome.

12       A.   That's, and I am sorry about doing this to

13    you, but has somebody, has collectively IED seen all of

14    the documents that may be relevant to these questions

15    that have been produced? yes.  Has an individual at IED

16    gone through the particular collection as presented to

17    you? no.

18               And I'm slightly confused as to this document

19    issue because I'm prepared to, I'm confident that I can

20    address your questions as to -- as well as anybody else

21    as to the procedures and what occurs in terms of

22    advertising and marketing at Incredibly Edible Delites.

23       Q.   Who is responsive at IED -- who is

24    responsible at IED for ensuring that production

25    requests are met, complied with?
```

4bb2b768-2614-4350-b73b-ae71509b0d10

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                    Andrea Mirin

Page 75

1    everything, possibly not.  Their franchisees have done

2    local advertising, advertising campaigns that unless

3    the franchisees elect to send a copy, may not be seen.

4        Q.   But, if I'm understanding your testimony, the

5    vast majority of the documentation would be seen by

6    Susan Ellman or Ellen Davis?

7        A.   Again, possibly, because you're talking about

8    each individual paper along the way.  They run the

9    company.  They can't stop and look at every piece of --

10   they are in the president and vice president roles, so

11   would it be likely that -- in a small, family-owned

12   company, so is it likely that they see substantially

13   everything that goes around? yes.  Were they involved

14   in the initial design? yes.  But the procedure is the

15   procedure.

16       Q.   Is there anyone else at IED who would be

17   likely to see this information?

18       A.   What type of information?  I mean, it's, it's

19   broad.  So is there an employee that might be specific

20   to a particular faction of this? yes.

21       Q.   I think you testified that Susan Ellman and

22   Ellen Davis would see -- they would be the ultimate

23   decision-makers on advertising, marketing, and

24   franchises, and they would be involved in almost all of

25   the happenings, for lack of a better word, in these

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                              Andrea Mirin

Page 79

1    Incredibly Edible Delites, Inc.  It has licensed the

2    right to Incredible Franchise Corporation and

3    subsequently to all of franchisees, and at this time, I

4    believe there are 32.

5         Q.   And have you reviewed all the communications

6    that are referenced in this request where it says

7    "identify any and all communications both written and

8    oral between IED and all persons"?

9              MR. EARLEY:  Objection as to -- just

10   renewing, overbroad.

11        A.   Have I reviewed absolutely everything between

12   -- here's where, again, this is semantics in here,

13   because you're telling me that IED is both -- I'm

14   sorry.

15             Have I reviewed all communications

16   individually, no.

17        Q.   Okay.  If we could look at the production in

18   Exhibit 6, and if we could look specifically at IED

19   00038, which has a caption on it, underneath the case

20   caption, says "Franchising Correspondence To," have you

21   seen this document before?  It's a series of pages, I

22   understand, and take time to review them, generally, if

23   you'd like.

24             (Pause in the proceedings)

25        A.   I believe I have seen some of these pages.  I

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                    Andrea Mirin

Page 81

1    not have occurred to Susan Ellman and Ellen Davis that

2    this would be something to review.

3        Q.   Okay.  But that really wasn't my question.

4        A.   I'm sorry then.

5             Was it handed to me? no.

6        Q.   You haven't reviewed that packet of

7    information; although, you may have seen some portions

8    of it --

9        A.   Correct.

10       Q.   -- that's your testimony, correct?  Okay.

11            If you want to put that aside.

12                MR. WALSH:  Could we reference the

13    document she is holding.

14                MR. RICH:  Yes.  IED 000038 through IED

15    000202.

16       Q.   If we could go to the next set of documents

17    within Exhibit 6, which is labeled, beginning with

18    Bates stamp IED 000203 through IED 000361, caption on

19    the front page is "Franchising Correspondence To."  If

20    you want to take a moment to review that, generally, at

21    least.

22                (Pause in the proceedings)

23       Q.   Have you seen these documents before?

24       A.   Again, I might have seen individual pages of

25    it but not as this collection.

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                          Andrea Mirin

Page 83

1          Q.   Okay.  Moving onto the next set of Bates

2     stamped materials -- actually, I'm sorry, for the

3     record, the first packet of correspondence was

4     franchising correspondence three.

5               The next set of materials beginning with

6     Bates stamp 000362 through 000501 would be this packet

7     marked as franchising correspondence one.  Have you

8     seen these documents prior to today?

9          A.   My answer would be the same.

10         Q.   Okay.  And nobody, no one ever mentioned the

11    existence of these documents to you?

12         A.   Did I know that there had been inquiries that

13    related to the franchise opportunities? yes.  Am I

14    familiar with the general concept behind these

15    documents? yes.  They had been mentioned not

16    specifically related to a document, per se, but more of

17    the general process I was familiar with, and I was

18    familiar with that prior to 2005.

19         Q.   And if we could move ahead a little to what

20    is Bates stamped IED 000682, take that, if you'd like.

21         A.   Thank you.

22         Q.   A document -- well, first of all, IED 00682

23    through IED 00719, packet of materials.

24         A.   Mm-hmm.

25         Q.   Captioned at the top of the first page is

9/6/2005                                                              Andrea Mirin

Page 135

1    that correct?

2        A.    Primarily, yes.

3        Q.    There were others?

4        A.    I'm not 100 percent sure.

5        Q.    Well, what were the others that you reviewed?

6        A.    As we discussed previously, I reviewed

7    materials from the website, on the website.

8        Q.    I'm not asking about the website.  I'm asking

9    about advertising and marketing materials, again, from

10   the late 1980's through 2004 regarding the Fruitflowers

11   marks.  This is confined in time, it's confined in

12   scope.

13                  MR. EARLEY:  Objection.

14       A.    No, I did not review other materials.

15       Q.    Thank you.

16            Let's move on to interrogatory 15, "Identify

17   the bases including but not limited to documents and

18   any other communications with any persons for the

19   allegations set forth in paragraph 34, members of the

20   industry and public recognize the marks 'Fruitflowers,'

21   'fruitflowers.com' and 'Fruit Flowers,' two words, to

22   be the exclusive property of IED."  Are you familiar

23   with this interrogatory?

24       A.    Same answer as I provided previously.

25       Q.    Okay.  Did you prepare any documentation that

4bb2b768-2614-4350-b73b-ae71509b0d10

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                        Andrea Mirin

Page 148

1   than you yourself do?

2                    MR. EARLEY:   Objection as to relevance,

3   but she can answer.

4        A.   On a specific day-to-day basis in their

5   functions as the president and vice president in charge

6   of the corporations, likely, yes.

7        Q.   Okay.  Do you make advertising decisions?

8        A.   No.  Me as an individual?

9        Q.   Yes.  In the course of your employment with

10  IED, do you make any advertising decisions on behalf of

11  the company?

12       A.   No.

13       Q.   Do you make any marketing decisions on behalf

14  of the company?

15       A.   No.

16       Q.   Do you make any decisions regarding

17  franchises on behalf of the company?  When I say "the

18  company," I'm referring to IED collectively, actually,

19  on behalf of either company.

20       A.   No.

21       Q.   Do your job responsibilities include

22  advertising, marketing, or franchising?

23       A.   To the extent that there may be legal

24  questions that arise related to this, these matters, or

25  to the extent I may be consulted related -- I may be

4bb2b768-2614-4350-b73b-ae71509b0d10

Incredibly Edible Delites vs. Edible Arrangements

9/6/2005                                                    Andrea Mirin

Page 206

1    at that, please.

2         A.    At this time, I'm just looking through, not

3    reading through each of the articles, to save us time.

4              I've looked at these pages.

5         Q.    Now, to go back for one second, it's your

6    testimony that you have no knowledge of any

7    advertisement that has been made of the term "Fruit

8    Flower," singular?

9         A.    My testimony as an individual is that I can't

10   say -- that I have no knowledge of it.  As the company,

11   I am not certain.  I believe that it might have been

12   used at some point in advertising and might have come

13   -- and may have been used in marketing or promotion

14   article written by somebody.  I cannot say definitively

15   on behalf of the company at this time.

16        Q.    So you don't know if it has or has not?

17        A.    At this time, I don't recollect.

18        Q.    If it was or wasn't?

19        A.    I don't recollect, as the company, correct.

20        Q.    If it was or wasn't, correct?

21        A.    I believe I've answered you.

22        Q.    You haven't answered me.  Are you saying you

23   don't remember if it ever was or it might have been and

24   it may not have been, there's two different responses

25   to that.

4bb2b768-2614-4350-b73b-ae71509b0d10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT



)
INCREDIBLY EDIBLE DELITES,            )
INC., AND INCREDIBLE FRANCHISE        )
CORPORATION,                          )
          Plaintiffs,                 )
                                      )   Civil Action No.
VS                                    )   3:02CV1529(AVC)
                                      )
EDIBLE ARRANGEMENTS, LLC, AND         )   Volume 2
EDIBLE ARRANGEMENTS FRANCHISE         )
GROUP, INC.,                          )
          Defendants.                 )
                                      )


DEPOSITION OF: ANDREA ELLMAN MIRIN

DATE:          SEPTEMBER 7, 2005

HELD AT:       UNITED STATES DISTRICT COURT
               450 MAIN STREET
               HARTFORD, CONNECTICUT


Reporter:  JAMES A. SCALLY, RMR, CRR, LSR #80
        BRANDON SMITH REPORTING SERVICE
44 Capitol Avenue          Six Landmark Square

Hartford, CT 06106              4th Floor

   (860)549-1850          Stamford, CT 06901

   (800)852-4589             (203)316-8591

                            (800)852-4589

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Case 3:02-cv-01529-AVC    Document 146-8    Filed 11/30/2005    Page 16 of 26

Incredibly Edible Delites vs. Edible Arrangements
9/7/2005                                                    Andrea Ellman Mirin

Page 383

1        A    Yes.  Possibly Ronald Ellman, possibly Robert

2    Davis, possibly Ellen Davis, possibly Susan Ellman.

3        Q    So all these people may know, but you do not?

4    True?

5        A    Possibly, true.

6        Q    Okay.  Did you know before the commencement

7    of this deposition that the franchisee information

8    would be inquired of in this deposition?

9        A    I read the notice of deposition.  I'm trying

10   to answer you truthfully here.  I read the notice of

11   deposition.  My understanding with regard to some of

12   the franchising information was related more to sales

13   and marketing aspects.  But did I -- to the extent it's

14   in the notice, it's in the notice.

15       Q    I'm sorry, the response was you did or did

16   not know that franchising would be inquired of in the

17   deposition?

18       A    I did know aspects of it would be inquired

19   about.

20       Q    Okay.  What did you do to gather documents

21   responsive to that?

22       A    I did not gather documents responsive because

23   it was my understanding I was being deposed for

24   structural questions.

25              MR. WALSH:  Okay.  At this point in

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Case 3:02-cv-01529-AVC    Document 146-8    Filed 11/30/2005    Page 17 of 26

Incredibly Edible Delites vs. Edible Arrangements
9/7/2005                                            Andrea Ellman Mirin

Page 397

 1    question --

 2         A     How would --

 3         Q     How would we know, simply, I'm asking you now

 4    looking at the documents and looking back at that

 5    period of time, how, through any means, documentary or

 6    otherwise, would we know the basis that someone did not

 7    purchase a franchise?

 8         A     I do not know.

 9         Q     Okay.  Well, would anyone have knowledge of

10    the reason that these persons referenced on these pages

11    of exhibits, again, Bates stamp 0999 through 1070, did

12    not purchase a franchise?

13         A     I can only surmise that the individuals as

14    listed here would know why they didn't purchase.

15         Q     Well, I appreciate that, and certainly I

16    guess the person who has the interest would be the best

17    declarant, but my question is, from you as a 30(b)(6)

18    designee, who at your business would know or possess

19    that information as to any reason why any one of these

20    people may not have purchased a franchise during the

21    period in question?

22         A     I don't know if anybody would have that

23    knowledge.

24         Q     Okay.  Well, did you make any effort to

25    determine prior to today the basis for anybody not

Incredibly Edible Delites vs. Edible Arrangements

9/7/2005                                                        Andrea Ellman Mirin

Page 410

1        Q    Okay.  Did you consult with Ronald Ellman at

2    all concerning the purchase or sale of franchises at

3    any time prior to this deposition?

4        A    Only briefly as it was addressed in general

5    conversation.

6        Q    When?

7        A    As it may have been mentioned in dinner

8    conversation.  Ronald Ellman is my father.

9        Q    When?

10       A    I cannot say.

11       Q    Can you tell me what decade?

12       A    In 2000.  I'm sorry, within the 2000s.

13   Within the last five years.

14       Q    Okay.  Nothing for the period of time 1990

15   through 2000?

16       A    I do not recollect.

17       Q    Okay.  Do you know when the first franchise

18   was sold?

19       A    The first franchise was sold in 1993.

20       Q    Okay.  Now, concerning this document, 039,

21   that we've been referring to, you said you can identify

22   the handwriting as that of your father?

23       A    Correct.

24       Q    Okay.  And was your father actively involved

25   in responding to or dealing with the franchisees'

Brandon Smith Reporting

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Incredibly Edible Delites vs. Edible Arrangements

9/7/2005                                               Andrea Ellman Mirin

Page 417

```
 1      A    No.

 2      Q    Was it more than three years ago?

 3      A    No.

 4      Q    Was it in 2004?

 5      A    I believe so.

 6      Q    Okay.  Was that the only time you've ever

 7   spoken to him, to the best of your recollection?

 8      A    I believe so.

 9      Q    Have you had other communications with him?

10      A    Yes.

11      Q    What kind?

12      A    Personal.

13      Q    Meaning non-business?

14      A    Yes.

15      Q    Why personal?  What's the nature of the

16   personal discussions with him?

17      A    Personal communications.  He sent a gift when

18   my son was born this year.

19      Q    I'm sorry?

20      A    He sent a gift, and it was a gift when my son

21   was born.  Thank you.

22      Q    So you wrote him a thank you note?

23      A    Yes.

24      Q    Any other communications with him besides

25   that one?
```

Brandon Smith Reporting

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Incredibly Edible Delites vs. Edible Arrangements

9/7/2005                                                           Andrea Ellman Mirin

Page 419

1     understand.  I do not know if he is independently

2     incorporated or not.

3          Q     Okay.  Have you made any inquiry of him

4     concerning franchises that he has sold since coming --

5     becoming an independent contractor for the franchise

6     group?

7          A     No, I have not.

8          Q     Is he paid by the franchise group, by the

9     way, or Incredibly Edible Delites, Incorporated?

10         A     He works on commission.

11         Q     Paid by who?

12         A     Franchise group.

13         Q     Okay.  I apologize if this is repetitive, but

14    did you say you have contacted him or not with respect

15    to documents that might be responsive to our requests

16    for franchise information in this case?  You have not,

17    do I understand?

18         A     No, I have not.

19         Q     Do you know if Ms. Ellman or Ms. Davis have?

20         A     I do not know.

21         Q     Okay.  When he secures a sale, does he speak

22    to Ms. Ellman or Ms. Davis?

23         A     Yes.

24         Q     Why does he speak to them rather than you or,

25    is it Barkin?

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Incredibly Edible Delites vs. Edible Arrangements

9/7/2005                                                      Andrea Ellman Mirin

Page 455

```
 1       A    Yes.

 2       Q    Okay.  So are you telling me that since he

 3   became involved, no one takes any calls and writes down

 4   messages or accepts letters of people inquiring of

 5   franchise sales?

 6       A    No, I'm not saying that.

 7       Q    So where is that data, then?

 8       A    I do not know that it exists.

 9       Q    Have you looked for it?

10       A    Personally, no.

11       Q    Who would know if it exists?

12       A    I'm sorry.  If it --

13       Q    No.  Question:  Who would know if it exists?

14   You've indicated that you don't.

15       A    The company would know if it exists.  It

16   would be in the company's records.

17       Q    What person at the company would know if it

18   exists?  Possibly Ms. Davis and Ms. Ellman?

19       A    Possibly.

20       Q    Okay.  Anyone else possibly?

21       A    Possibly any of Incredibly Edible Delites'

22   human -- I'm sorry -- any of the individuals who answer

23   phone calls at either Incredibly Edible Delites or for

24   the Franchise Corporation.

25       Q    Okay.  Do you understand or do you have any
```

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Incredibly Edible Delites vs. Edible Arrangements

9/7/2005                                               Andrea Ellman Mirin

Page 458

1         A    The --

2         Q    What was that data?

3         A    Franchise reports that would accompany --

4    that would accompany royalty payments.

5         Q    All right.  Describe this report to me.

6         A    I cannot describe it in detail.

7         Q    Describe the report for me, please.

8              MR. EARLEY:  Asked and answered.

9              MR. WALSH:  I didn't ask in detail.

10             MS. THOMPSON:  To the best of your

11   ability.

12        A    Statistical information submitted by the

13   franchisees based on the number of products, showing

14   the number of products that they sell in a particular

15   time period.  The number and type of product they sell

16   in a particular time period.

17        Q    Were there any other documents or data that

18   Ms. Ellman and Ms. Davis have access to other than the

19   UFOC documents and these franchise reports that you've

20   identified for me that identify the sales by

21   franchisees?

22        A    Not to my knowledge.

23        Q    So the only method of tracking franchise

24   sales is through these franchise reports?

25        A    To my knowledge.

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Page 463

1    the corporation, to the extent that that information is

2    contained within the documents that we have provided to

3    counsel.

4        Q    I'm sorry.  And this is when the questions

5    get to be cumbersome.  But to just tee it up, I

6    understand that you said within the US -- the UFOC's,

7    that data may be gleaned, and I asked is there any

8    other information or data source besides the UFOC's,

9    and I understood you to say that is the principal

10   source.  My question, then:  Is there some other source

11   beside the UFOC's?

12       A    Possibly.

13       Q    What is that other source?

14       A    I personally do not know.

15       Q    Okay.  Who at the business would know?

16       A    I don't know.

17       Q    Well, who -- when you say you don't know,

18   meaning you don't know because you don't have enough

19   information about the business to know who would have

20   that information?

21       A    I do not know if there is somebody who

22   specifically would be able to -- to say -- I do not

23   know that there is somebody who would specifically be

24   able to say -- to answer that question.

25       Q    Who would have the information concerning

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Incredibly Edible Delites vs. Edible Arrangements
9/7/2005                                        Andrea Ellman Mirin

Page 464

1    sale of franchises and sale of products by franchisees?

2        A    Susan Ellman and Ellen Davis.

3        Q    Okay.  Do I understand that that data, to the

4    best of your knowledge, is contained within the

5    franchise reports?

6        A    To my knowledge, yes, it is contained in the

7    franchise -- yes, to my knowledge.

8        Q    And they would have access to those, true?

9    They have those documents in their possession

10   currently?

11       A    To my knowledge, they have the current form

12   of their UFOC -- to my knowledge, they have their

13   current UFOC.  Other documents pertaining to this,

14   including the current form of the UFOC, have been given

15   to counsel.

16       Q    Okay.  And the franchise reports, who has

17   those?

18       A    To my knowledge, Ellen Davis, Susan Ellman.

19       Q    Going back to the UFOC's for a moment, who

20   prepares that document?

21       A    I believe it's prepared by counsel.

22       Q    Which counsel?

23       A    I'm -- I believe Lane Fisher.

24       Q    Lane Fisher?

25       A    Correct.

a8caf05f-aaf0-4f41-a2db-3e859501d06e

Incredibly Edible Delites vs. Edible Arrangements

9/7/2005                                          Andrea Ellman Mirin

Page 486

1    the franchise group and Incredibly Edible Delites, have

2    not informed your franchisees that they own the marks

3    that you claim that you own in this deposition?

4            MR. EARLEY:  Can I make an objection as

5    to relevance?

6        Q    Do you understand the question?  Do you

7    understand the question?

8        A    I understand the question.  I'm just -- I'm

9    slightly confused by it.

10       Q    Then don't answer the question.  That's the

11   reason why I asked if you understand it.

12           Have you told the franchisees that the

13   franchisor owns or has the right to FruitFlower?

14       A    I do not know.

15       Q    That's singular.

16       A    I do not know.

17       Q    Please take a look at the exhibit pertaining

18   to the 2002 UFOC.  That document is Bates stamped 682.

19   Do you have the document numbered 682?

20       A    Yes, I do.

21       Q    Okay.  As part of Exhibit No. 6, 682 is in

22   fact the franchise-offering circular under the years

23   2002, true?

24       A    True.

25       Q    And do you claim to know what this document

Incredibly Edible Delites vs. Edible Arrangements
9/7/2005                                                      Andrea Ellman Mirin

Page 492

1    not seeing it.  I don't know if I've seen it.

2         Q    Does one exist?

3         A    I'm not certain.

4         Q    On behalf of the corporation, you're

5    testifying you're not certain --

6         A    No.

7         Q    Hold on.  Let me finish the question, please.

8              As the 30(b)(6) designee, you're testifying

9    that you don't know if a license agreement exists

10   between the plaintiffs for the franchise marks that are

11   the subject of this litigation?

12        A    I believe on behalf of the corporation that

13   one does exist.

14        Q    Oh.

15        A    I was saying that I as an individual do not

16   know that I -- that I have seen it.

17        Q    You said you believe one does exist.  Why do

18   you believe one exists?

19        A    Because -- because it is so defined in the

20   document.

21        Q    Because it's so defined in the document Bates

22   stamped 682 through 719 as the franchise-offering

23   circular, true?

24        A    True.

25        Q    Who would know whether or not there is a

Brandon Smith Reporting

a8caf05f-aaf0-4f41-a2db-3e859501d06e